# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ASHTON BRINKLEY and JARED
SPELL,

     Plaintiffs,

     v.

MICHAEL GLENN WATERS, an
individual; APPLING COUNTY
SCHOOL DISTRICT; DR. SCARLETT
M. COPELAND, in her official
and individual capacities; DR.
GENE A. STARR, in his official
and individual capacities;
VIOLET MARCHMAN, in her
official and individual
capacities; JAMES CAROL WATERS,
an individual; WANDA L. WATERS,
an individual; JOHN/JANE DOES
Nos. 1-5,

     Defendants.

No. 2:18-CV-89

## ORDER

    This matter comes before the Court on the Motion for Summary Judgment, dkt. no. 88, filed by Defendants Appling County School District, Dr. Scarlett Copeland, and Dr. Gene Starr (collectively, "Defendants"). Also pending before the Court is the Motion to Strike, dkt. no. 113, filed by Plaintiff Ashton Brinkley and Jared Spell (collectively, "Plaintiffs"). The motions are fully briefed and ripe for review. For the reasons stated below, Defendants'

Motion for Summary Judgment is **DENIED in part** and **GRANTED in part**, and Plaintiffs' Motion to Strike is **DENIED**.

### Factual Background

This case involves inappropriate sexual conduct by a high school teacher toward Plaintiffs, two former students. Plaintiffs both started their freshman year at Appling County High School in the fall of 2012. Dkt. No. 102-1 ¶ 21. At some point in the fall of 2010, Defendant Michael Waters ("Waters")[1] applied for employment with the Appling County School District ("A.C.S.D") and was hired as a math teacher for Appling County High School. Id. ¶¶ 2, 3.

In Waters' application for hire, he answered "yes" to the following questions: (1) have you ever had a teaching certificate or credential denied, revoked or suspended in any state and (2) have you ever been placed on disciplinary probation or been suspended from a job, college or university. Id. ¶ 12.

In a written explanation attached to his application, Waters outlined that the Professional Standards Commission ("PSC")[2] had suspended his teaching certificate for twenty days following a 2009 incident at his prior place of employment—the Camden County School District. Dkt. No. 107-7 at 67. In his attached explanation,

---

[1] Defendant Waters has not moved for summary judgment in the present case.
[2] The PSC is the state agency in Georgia that licenses all public school teachers in the state. In order to teach in a public school in Georgia, a teacher must have a valid certificate with the PSC. Dkt. No. 102-1 ¶ 8.

Waters indicated that multiple students had made allegations against him for "inappropriate actions" but he claimed that the "only action [he] acknowledged for the suspension was having an inappropriate conversation with a student." Id. at 68. Before hiring him, an A.C.S.D. interview committee[3] probed Waters about the written explanation he provided in his employment application. Dkt. No. 102-1 ¶ 14. Waters further indicated that the previous allegations were turned over to the PSC and the Camden County Sheriff's Department. Dkt. No. 88-1 at 11.

Upon receiving the Camden County allegations, the PSC conducted an investigation and issued a Probable Cause Case Report (the "PSC Report") on Waters' conduct. Dkt. No. 102-5 at 2. The PSC Report contains allegations that Waters "inappropriately touched students. Specifically, several male students reported that the male educator had discussed sexual matters and touched them inappropriately." Id. at 2. The report detailed the following relevant investigative findings, which are undisputed:

> The system discovered that four students alleged inappropriate conduct by the educator [Waters]. The students alleged that the educator discussed sexual matters and touched them inappropriately.

> The system notified DFCS. DFCS turned the investigation over to law enforcement.

> The law enforcement investigator assigned to the case interviewed numerous witnesses. He felt that the most

---

[3] The interview committee consisted of Defendant Starr, the chair of the math department, and a non-party math teacher. Id. ¶ 5.

credible of the witnesses was Student 1 that reported
the educator touched him when he was a freshman (now a
senior) at the high school. Student 1 reported that after
the educator touched him he told the educator that he
would kill him if he ever touched him again. Student 1
dropped out of the FFA program and avoided the educator.

The investigator interviewed two other students
([students] 2 & 3). These two students had apparently
collaborated with each other. Student 2 stated that the
educator had inappropriately touched him on four
different occasions. Student 3 stated that he had
witnessed the educator touching Student 2. The statement
of Student 3 was not consistent with Student 2's
statement. The investigator discounted these statements.
The DA did not proceed with criminal charges based on
this information.

. . .

The students' statements were consistent that the
educator talked to them about their personal lives. The
students related that the topic often involved sexual
questions and information.

The educator [Waters] wrote a four page single spaced
email explaining why he thought students would tell lies
about him. The educator specifically mentioned student
1 who had not been in the FFA program since his freshman
year.

. . .

[The associate principal] was involved in the
investigation of the educator. She believes that the
students were truthful. She thinks that the students
have difficulty with their statements, but overall, they
were truthful.

The educator's direct supervisor and the investigator of
the current matter stated that he felt that the students
were attempting to discredit the educator. He did think
that student 1 was credible.

. . .

> The educator states that he may have discussed sexual
> topics with students.

Id. at 2-3.

Under a subsequent section labeled "Findings of Fact," the
PSC Report concluded the following:

> Students alleged that the educator touched them
> inappropriately and discussed sexual topics with them.
> The students' statements regarding inappropriate
> touching were not consistent. The educator acknowledged
> discussing sexual topics with the students.

Id. Ultimately, the PSC recommended a twenty-day suspension of
Waters' teaching certificate. Dkt. No. 102-2 ¶ 2. It is undisputed
that the A.C.S.D. obtained and relied upon the PSC Report prior to
hiring Waters. Dkt. No. 109 ¶ 2. However, no monitoring or
restrictions, other than normal supervision of teachers, were
placed on Waters at Appling County High School until the August
2014 incident discussed below. Dkt. No. 109 ¶ 7.

Plaintiffs met Waters during their freshman year at Appling
County High School when they joined Envirothon—a school club for
which Waters was the faculty sponsor.[4] Dkt. No. 102-1 ¶ 22-23. One
of the other students in Envirothon was C.F., who was a ward of
Waters and living with him during this time. Id. at 27. From 2012

---

[4] Envirothon is a program that recognizes students in high school who are
interested in forestry, agriculture, entomology, and other areas of wildlife.
Dkt. No. 102-1 ¶ 24. The Envirothon team would compete against other teams
throughout the state and, at times, teams from other states. Id. ¶ 25.

until August 2014, A.C.S.D. had no knowledge of any allegations of possible inappropriate conduct by Waters with either Plaintiffs or any other students. Id. ¶ 32.

However, in August of 2014, an incident involving Waters and Plaintiff Brinkley was reported to school officials. Specifically, Gina Brinkley, Plaintiff Brinkley's mother ("Ms. Brinkley"), and Gina Brinkley's boyfriend, Steve Clinich, spoke to Principal Gene Starr ("Defendant Starr") about the fact that Plaintiff Brinkley did not come home after band practice the previous night. Dkt. No. 102-1 ¶ 33. After Plaintiff Brinkley did not come home at his usual time, Ms. Brinkley tracked her son's location to Waters' home. According to Defendants, Clinich informed Starr that when Brinkley's mother arrived, all that she saw was Plaintiff Brinkley come out of a "darkened room." Dkt. No. 88-1 at 4.

Plaintiffs' version of these facts, however, give a much more detailed depiction of the events. As stated in her deposition, Ms. Brinkley called Plaintiff Brinkley multiple times before tracking his location and driving over to Waters' house. Dkt. No. 102-10 at 3. Upon arriving at the Waters' residence, she beat on the door until she was let in by C.F. Id. at 4. She then went straight to Waters' bedroom and turned the knob, which was locked. Id. at 8. At that point, Ms. Brinkley said she was "about to bust the door down." Id. When Plaintiff Brinkley opened the bedroom door, the bedroom lights were off and Waters was "in his underwear only,

6

laid up in the bed." Id. Further, it appeared that Plaintiff Brinkley had been crying uncontrollably. Id. at 9. The next day, Ms. Brinkley relayed all of this to Defendant Starr. Id. at 10. This included her telling Starr that Waters was "laid up in his bed in underwear only." Id.

After Defendant Starr was made aware of this possible inappropriate conduct by Waters, Starr informed Superintendent Scarlett Copeland ("Defendant Copeland") about the allegations, and Copeland directed Starr to conduct an investigation. Dkt. No. 102-1 ¶ 9. As a part of the investigation, Defendant Starr called PSC Investigator John Grant to see if any other complaints had been filed against Waters. Dkt. No. 102-25 at 5. Grant indicated that two prior complaints regarding Waters had been filed; there was one complaint in 2006 which PSC did not investigate and another incident in 2009 for which Grant claimed, "[Waters] received a one-month probation for inappropriate touching of male students." Id. Grant suggested that Defendant Starr turn the current matter over to the Division of Family and Children Services ("DFACS"). Id.

Defendant Starr—along with other staff at the school—also spoke to Waters and Plaintiff Brinkley. Id. ¶ 37. When questioned why he was at Waters' house that night, Plaintiff Brinkley indicated that he thought Waters was mad at him, so he went to Waters' house after band practice to speak with him. Id. ¶ 38.

Plaintiff Brinkley stated that nothing inappropriate occurred with Waters that night. Id. ¶ 39. Nonetheless, Defendant Starr turned the matter over to DFACS for further investigation.[5] Dkt. No. 107-1 at 45.

In addition to turning the matter over to DFACS, Starr also informed Defendant Copeland of his investigative findings and issued a directive letter to Waters regarding the incident. Dkt. No. 102-1 ¶ 42. The directive letter instructed Waters to only maintain appropriate and professional communication with students and not to have students in his home or bedroom alone; the directive letter also implemented a "blanket prohibition" on discussing personal matters with students. Dkt. No. 102-1 ¶ 43. Defendant Starr advised Waters to have no further contact with Plaintiff Brinkley. Dkt. No. 102-25 at 6. Further, Defendant Starr assigned a support teacher to be in all of Waters' classes and assigned another teacher to be co-advisor of the Envirothon team. Dkt. No. 102-1 ¶¶ 44-45. However, Defendant Starr clarified that the co-advisor "wasn't to monitor him. She was to be a part of the program and to be included in what the program did. She was not an administrative over him." Dkt. No. 107-1 at 59. The co-sponsor was not informed of the allegations involving Waters. Id. Waters was still allowed to go on out-of-town Environthon trips with students

---

[5] DFACS concluded there was insufficient evidence to pursue charges against Waters regarding the August 2014 bedroom incident. Dkt. No. 102-1 ¶¶ 40-41.

after the August 2014 incident. Dkt. No. 109 ¶ 10. Waters responded to Starr's directive letter through a response letter telling Starr that he had no intention to follow the mandates set out in the directive letter. Dkt. No. 107-7 at 45-49. In his response, Waters asserted that he had not and would not ever "cross the line" by having an unprofessional relationship with any of his students. Id. at 45.

In August 2015, the Appling County Sheriff's office informed A.C.S.D. that Waters had been arrested for sexual misconduct with students. Dkt. No. 102-1 ¶ 46. The day after Waters was arrested, Defendant Starr went to the jail and obtained an immediate resignation from Waters. Id. ¶ 47. Both Plaintiffs and Defendants agree that from Plaintiffs' freshman year until approximately Spring 2015, Waters engaged in inappropriate conduct of a sexual nature with Plaintiffs, including sexual acts, at his house and on some of the Envirothon trips. Id. ¶ 30. Neither party disputes that Waters continued to sexually abuse at least one of the Plaintiffs in this case after the August 2014 bedroom incident occurred. Dkt. No. 109 ¶ 11.

### Plaintiffs' Claims

Plaintiffs contend that Defendants are liable for injuries caused by the repeated sexual molestation and other sexual acts done to them by Waters. Relevant to Defendants' motion for summary judgment are the causes of action brought against A.C.S.D.,

Defendant Copeland, and Defendant Starr. Specifically, Plaintiffs allege that: (1) A.C.S.D. violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., ("Title IX"); (2) all Defendants are liable for the deprivation of Plaintiffs' Fourteenth Amendment substantive due process rights, in violation of 42 U.S.C. § 1983 ("section 1983"); and (3) all Defendants were negligent in hiring, training, and supervising Waters.[6]

As a preliminary matter, the parties dispute what evidence the Court should consider in deciding the summary judgment motion. In conjunction with their reply brief, Defendants filed an affidavit from Dr. Paul Shaw ("Shaw"). Dkt. No. 108. In response, Plaintiffs filed a Motion to Strike the affidavit, arguing that Defendants failed to timely disclose Shaw as a witness. Dkt. No. 113. Thus, before addressing Defendants' Motion for Summary Judgment, the Court will first address Plaintiffs' Motion to Strike.

### PLAINTIFFS' MOTION TO STRIKE

### I.   Standard of Review

An affidavit submitted in connection with a summary judgment motion is subject to a motion to strike if it does not meet the standards set forth in Federal Rule of Civil Procedure 56. Story

---

[6] Plaintiffs made clear in their response to the motion for summary judgment that they do not contest the requested summary judgment on Plaintiffs' state law claims for negligent hiring, training, and supervision of Waters. Dkt. No. 102 at 24.

v. Sunshine Foliage World, Inc., 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000). Pursuant to Rule 56(c)(4), an affidavit used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. Discussion

Specifically, Plaintiffs request that the Court strike Shaw's affidavit because "none of the rules or timelines were complied with by defendants." Dkt. No. 113 at 2. Plaintiffs take issue with the fact that Defendants "waited to disclose Dr. Shaw not only after the discovery period had expired but also after Plaintiffs had completed their briefing." Id.[7]

Indeed, under Federal Rule of Civil Procedure 26(a)(I)(A)(i), Defendants are required to provide initial disclosures of "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the

---

[7] Plaintiffs also contend that Dr. Shaw's testimony should be excluded because it is expert testimony that fails to comply with applicable discovery and evidentiary rules. Dkt. No. 113 at 2. However, such evidence is not based on scientific, technical, or other specialized knowledge as required to fall within the scope of Federal Rule of Evidence 702. Rather, the statements contained in Shaw's affidavit are based on his personal knowledge as Director of Educator Ethics for the PSC and as a member of the Management Team of the PSC Educator Ethics division. As the Eleventh Circuit has consistently recognized, lay witness testimony can be "based upon [a witness's] particularized knowledge garnered from years of experience within [a particular] field" and will not run afoul of the prohibitions set forth in Federal Rule of Evidence 701(c). United States v. Thomas, 631 F. App'x 847, 850 (11th Cir. 2015); see also United States v. Hill, 643 F.3d 807, 841 (11th Cir. 2011) ("Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences.").

subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Defendants admit that they did not disclose Shaw in their initial disclosures. Dkt. No. 115 at 2. However, it is Defendants' position that such disclosure was unnecessary because they did not intend to rely on Shaw's testimony in support of their defenses. Id. Instead, Defendants argue, the only reason they submitted Shaw's affidavit was to impeach and rebut certain statements within the affidavit of PSC investigator John Grant, which Plaintiffs submitted in conjunction with their Response Brief. Dkt. No. 102-14. Because Grant's affidavit provided new testimony that was not previously disclosed, Defendants argue that they should be permitted to use Shaw's affidavit to impeach and rebut this evidence. Id. As laid out in Rule 26, initial disclosure is not required when the use of testimony is "solely for impeachment." Fed. R. Civ. P. 26 (a)(I)(A)(i). Here, in their response brief, Plaintiffs submitted an affidavit from PSC investigator Grant that stated he "found, based on [his] investigation, that Mr. Waters did inappropriately touch student 1," despite any such conclusive finding appearing otherwise in the PSC Report. Dkt. No. 102-14 ¶ 6. In response to this new testimony, Defendants submitted Shaw's declaration as evidence that such inappropriate touching would warrant a minimum one-year suspension of the educator's teaching certificate as opposed to the twenty-

12

day suspension that Waters actually received. Dkt. No. 108 at 17. As such, the Court finds that Shaw's testimony is being offered solely to disprove the testimony being offered by Plaintiffs in their response brief. United States v. Lezcano, 296 F. App'x 800, 803 (11th Cir. 2008) (quoting United States v. Frazier, 387 F.3d 1244, 1269 (11th Cir. 2004) (en banc) ("The purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party, and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge."). Because Shaw's testimony properly serves impeachment purposes, it is not subject to the Rule 26 initial disclosures deadline. Therefore, Plaintiffs' Motion to Strike is **DENIED**. The Court will consider both the Grant affidavit and the Shaw affidavit to the extent they are relevant to the determination of the claims discussed below.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   Legal Standard

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). Factual disputes that are "irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden with

nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## II.  Discussion

### a. Title IX

Plaintiffs bring their first claim under Title IX of the Education Amendments of 1972. Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Plaintiffs assert this claim solely against A.C.S.D., an education program that receives federal funds.[8]

Plaintiffs contend they were subjected to harassment and discrimination because of the repeated sexual molestation and other sexual acts done to them by Waters, and they argue that A.C.S.D. is liable under Title IX for failing to prevent this harassment. Dkt. No. 1 ¶¶ 69-79. The Supreme Court has recognized an implied right of action under Title IX for sexual harassment of a student by a teacher. Gebser v. Lago Vista Indep. Sch. Dist.,

---

[8] Paragraph three of the Complaint, dkt. no. 1 at 5, suggests that the Title IX claim is also against Defendants Copeland and Starr. The Eleventh Circuit has been clear, however, that Title IX claims cannot be pursued against individual defendants in their personal capacities. Williams, 477 F.3d at 1300. To the extent Plaintiffs intend to bring their Title IX claim against any individual, such claim must be dismissed.

524 U.S. 274, 277 (1998). Furthermore, the Supreme Court has held that Title IX places on public school systems the duty to protect students from intentional discrimination, including sexual harassment or abuse, by teachers. Franklin v. Gwinnett Cnty. Public Sch., 503 U.S. 60, 75 (1992f). To hold the school district liable, a plaintiff must establish that a district official with authority[9] to institute corrective measures on the district's behalf had (1) actual notice of the teacher's misconduct and (2) thereafter was deliberately indifferent to that misconduct. Gebser, 524 U.S. at 277. The standard for liability in Title IX cases is far less rigorous in cases involving teacher-on-student sexual harassment than those involving student-on-student sexual harassment. Hill v. Cundiff, 797 F.3d 948, 968 (11th Cir. 2015) (citing Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650-53 (1999)).

### 1. Actual Notice

Under Title IX's actual notice requirement, a plaintiff must demonstrate that the notice was "sufficient to alert the decision-maker to the possibility of sexual harassment by the teacher." J.F.K. v. Troup Cnty. Sch. Dist., 678 F.3d 1254, 1255-56 (11th Cir. 2012). Defendants contend "that school district officials did not have notice that [Waters] was sexually abusing the Plaintiffs."

---

[9] It is undisputed that Defendant Starr was an "appropriate person" with authority under Title IX. Dkt. No. 88-1 at 7.

Dkt. No. 88-1 at 7. In doing so, Defendants argue "that the only 'actual notice' about Waters' sexual misconduct to an 'appropriate person' was when the Appling County Sheriff's office informed the School District that Waters was arrested for sexual misconduct with students." Id. However, this argument overlooks the various allegations of sexual misconduct contained in the PSC Report. A Title IX plaintiff is not required to demonstrate prior knowledge that a particular student was being abused. Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1257 (11th Cir. 2010) ("[N]o circuit has interpreted Gebser's actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff herself."). Instead, actual notice may also be satisfied where the decision-maker had notice of a teacher's sexual harassment of students other than the plaintiff. Troup Cnty. Sch. Dist., 678 F.3d at 1260. Here, the PSC Report indicated that multiple students had alleged that Waters had touched them inappropriately. Moreover, the report indicated at least one student was credible and at least one official believed the students were truthful. A reasonable juror could conclude that the PSC Report was sufficient to alert A.C.S.D. to the possibility of future sexual harassment by Waters.

Yet, Defendants also suggest that Plaintiffs' attempt to fashion "actual notice" from the 2009 allegations of inappropriate touching should fail because Waters was in another school district

17

at that time. Dkt. No. 108 at 1. Defendants take issue with the fact that the prior allegations arose from students at Camden County—"none of whom were in the Appling County School District at the time those allegations were made." Id. at 5. However, "actual notice" for Title IX liability can still be found where a decision-maker's notice comes only from prior allegations at a different institution. See Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1288-90, 1294 (11th Cir. 2007). For example, in Williams, the Eleventh Circuit held that a Title IX plaintiff who suffered a violent sexual assault in a basketball player's dorm room sufficiently alleged actual notice on behalf of the university and its athletic department based on allegations received from the basketball player's prior university. Id. at 1294-95. Relevant to the Court's analysis of actual notice was the player's alleged prior sexual harassment of a female store clerk and employees at the player's former institution, which were both out-of-state incidents occurring two years before the plaintiff's assault. Id.

Further, Defendants contend the PSC Report does not provide actual notice because "law enforcement had investigated and cleared Waters of the allegations of sexual touching of students while Waters was in Camden County." Dkt. No. 88-1 at 11 (emphasis added). Thus, according to Defendants, "there was no 'actual notice' of sexual misconduct by Waters in Camden County" prior to

A.C.S.D.'s hiring him. Id. As a preliminary matter, nothing in the PSC Report indicates that Waters was cleared of the inappropriate touching allegations against him. At most, the PSC Report concluded there was insufficient evidence to pursue criminal charges. Drawing all inferences in favor of Plaintiffs, the PSC Report indicated at least one of the allegations was credible. A reasonable juror could infer that Waters was not cleared—as in exonerated—from the inappropriate touching charges leveled against him. Moreover, allegations of sexual misconduct, standing alone, may be sufficient to establish Title IX actual notice. Broward, 604 F.3d at 1259. As the Eleventh Circuit made clear in Broward, it is not "determinative of the School Board's liability that the results of [prior] investigations were ultimately inconclusive." Id. Contrary to Defendants' argument, conclusive findings of prior sexual misconduct are not required to establish liability. Even if prior complaints by other students are not clearly credible, at some point "a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children." Id. Here, a reasonable jury could find that A.C.S.D. had such knowledge. The complaints contained in the PSC Report, when viewed collectively, document multiple allegations of sexual assault—one of which the law enforcement investigator found likely to be credible. Dkt. No. 102-5 at 2-3. The fact that these prior

incidents were unconfirmed cannot, as a matter of law, absolve the School Board of Title IX liability. Broward, 604 F.3d at 1259.

## 2. Deliberate Indifference

In addition to requiring that an appropriate person have actual notice of the teacher's misconduct, a Title IX plaintiff must show that the official was deliberately indifferent to that misconduct. Id. Defendants claim that Plaintiffs have also failed to demonstrate that the district was deliberately indifferent. Dkt. No. 88-1 at 9. In response, Plaintiffs argue that the district was deliberately indifferent because it did "absolutely nothing" in response to the numerous allegations made against Waters in the PSC Report. Dkt. No. 102 at 16.

Deliberate indifference will be found only if a school district's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. Previous Eleventh Circuit decisions demonstrate that a "reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct." Broward, 604 F.3d at 1262 (citing Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005) and Davis, 233 F.3d at 1373–74). However, a failure to take any action in response to reports of harassment could constitute deliberate indifference. Davis, 526 U.S. at 654; Hurt

v. Shelby Cnty. Bd. of Educ., 198 F. Supp. 3d 1293, 1322 (N.D. Ala. 2016) ("[A] school board's failure to monitor or admonish an educator in response to a series of inconclusive investigations could create a jury question on deliberate indifference.").

In moving for summary judgment, Defendants do not contest that additional monitoring was not placed on Waters. Nor do Defendants dispute that they took no measures to circumscribe Water's personal or isolated interactions with students. Instead, Defendants argue that its reliance on two separate investigations by the PSC and Camden County cannot constitute deliberate indifference as a matter of law. Dkt. No. 88-1 at 11. Accordingly, Defendants insist "there is no evidence that any investigation by the District would have yielded a different result." Dkt. No. 108 at 4. Simply put, Defendants argue that "mere speculation does not create an issue of fact." Dkt. No. 88-1 at 11.

Although it would be merely speculative to conclude that a perfect investigation and more vigorous response to the complaints would have prevented Plaintiffs' sexual assault, that is not the inquiry here. At this stage, the Court must determine only whether a jury, as a matter of law, "could *not* find that [defendant]'s response to the [prior] complaints was clearly unreasonable under the known circumstances." Broward, 604 F.3d at 1260. Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that a material issue of fact has been raised as to

whether A.C.S.D. was deliberately indifferent to Water's alleged sexual misconduct. If A.C.S.D had actual notice of multiple allegations against Waters for inappropriate touching, its failure to institute any corrective measures aimed at ferreting out the possibility of Water's sexual harassment of his students *could* constitute deliberate indifference. Id. at 1261. A reasonable jury could find that A.C.S.D.'s decision was clearly unreasonable in light of the known circumstances. Therefore, Defendants' Motion for Summary judgment as to Plaintiffs' Title IX claim is **DENIED**.

### b. Section 1983 Municipal Liability

Plaintiffs also claim that A.C.S.D. is liable for Plaintiffs' injuries under 42 U.S.C. § 1983. Dkt. No. 102 at 20. As a preliminary note, Title IX and section 1983 are different statutes. Hill v. Cundiff, 797 F.3d 948, 976 (11th Cir. 2015). The Court's resolution of Plaintiffs' Title IX suit does not dictate the result of a separate section 1983 analysis. The standards for establishing liability under each mechanism varies to a certain degree. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 256 (2009). Under Title IX, for instance, a plaintiff can establish school district liability by showing an appropriate school official responded to actual notice of sexual harassment with deliberate indifference. Hill, 797 F.3d at 976. However, a plaintiff bringing a similar section 1983 claim must show a municipal custom, policy, or practice caused the harassment. Id.

Here, Plaintiffs alleges that A.C.S.D. violated their rights under the Due Process Clause of the Fourteenth Amendment. Dkt. No. 1 ¶ 82. Importantly, municipal entities such as A.C.S.D. cannot be held liable under section 1983 for the acts of their employees based on a theory of *respondeat superior*. Broward, 604 F.3d at 1263. Instead, "municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80 (1986). Thus, there are three ways Plaintiff can establish municipal liability: (1) identify an official policy; (2) identify an unofficial custom or practice that is "is so permanent and well settled as to constitute a custom and usage with the force of law"; or (3) identify a municipal official with final policymaking authority whose individual decision violated the plaintiff's constitutional rights. See Cuesta v. Sch. Bd. of Miami-Dade Cnty., Fla., 285 F.3d 962, 966, 968 (11th Cir. 2002).

Here, Plaintiffs assert only that "the egregious conduct of the school officials rises to the level of a 'custom, practice or policy' under 42 U.S.C. § 1983." Dkt. No. 102 at 21. Plaintiffs contend that the August 2014 incident, coupled with the allegations found within the PSC Report, demonstrates "repetitive multi-year conduct" that rises to the level of a custom on behalf of A.C.S.D. Id. at 22. However, Plaintiffs mischaracterize the custom at issue. "To prove § 1983 liability against a municipality based on custom,

a plaintiff must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001). Moreover, "if the municipality tacitly authorizes the constitutional deprivations committed by its employees or *routinely displays deliberate indifference* to the consequences of acts of misconduct by its employees, then the municipality's *failure to take corrective actions* can rise to the level of a custom or policy." Hackett v. Fulton Cnty. Sch. Dist., 238 F. Supp. 2d 1330, 1362 (N.D. Ga. 2002) (citing Griffin, 261 F.3d at 1308 (11th Cir. 2001)) (emphasis added).

Plaintiffs have not demonstrated that A.C.S.D. had a custom of routinely ignoring complaints of sexual harassment within its school district. Plaintiffs cite to Williams v. Fulton County School District to show establishment of a custom. 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016). In Williams, the district court held that a plaintiff had sufficiently alleged a custom existed where eight students submitted at least ten different reports of abuse to the principal within a period of two years. Id. The Williams plaintiff alleged that the school district was aware that a teacher had been hurting children for many years yet allowed the teacher to remain at the school without any reprimand. Id. Further, the Williams plaintiff submitted that the district repeatedly failed

to intervene and even shielded the teacher from any consequences through a pattern of intimidation and dismissiveness towards those who reported misconduct. Id. at 1129. As such, the court had little trouble concluding such allegations demonstrated a persistent failure to take disciplinary action when confronted with repeated abuse.

Here, unlike Williams, Plaintiffs have not demonstrated a multi-year pattern of sexual assault occurring at A.C.S.D. For one, the original complaints contained in the PSC Report were not submitted to A.C.S.D.; the school district had only after-the-fact knowledge of those complaints as part of the screening conducted during Waters' hiring process. Thus, A.C.S.D. had no chance to correct (or fail to correct) any employee misconduct at that time because Waters was not an employee of the district.[10]

Further, while the August 2014 complaint from Ms. Brinkley was brought to A.C.S.D. school officials, the investigation and response taken by Defendants differed vastly from the Williams

---

[10] It seems that Plaintiffs take issue with A.C.S.D.'s decision to hire Waters despite the allegations contained in the PSC Report. See, e.g., Dkt. No. 102 at 1-2 ("[T]he district simply buried its head in the sand and ignored this information that it was likely hiring a sexual predator."). While a single policymaking decision such as hiring an employee can serve as the basis for municipal liability under some circumstances, Plaintiffs have not alleged or submitted any argument for a theory of final policymaker liability. Without argument from Plaintiffs for this separate theory of liability, the Court will not consider whether liability is warranted on its own—especially since the Supreme Court has been particularly cautious in extending municipal liability to claims based on an allegedly inadequate hiring process. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410, (1997) (observing that such claims "pose the greatest risk that a municipality will be held liable for an injury that it did not cause.").

principal's dismissiveness. No reasonable juror could conclude that the prompt investigation and directive letter issued to Waters amounted to "tacit authorization" of Waters conduct by A.C.S.D. Hackett, 238 F. Supp. 2d at 1365 (holding that tacit approval derives from a district's repeated "failure to correct the problem"). The PSC Report and the August 2014 incident do not establish that A.C.S.D. routinely displayed deliberate indifference to acts of misconduct by its employees. Plaintiffs have not shown a "persistent failure to take disciplinary action against [Waters]" to support "the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of Monell." Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978)). As such, municipal liability based on an unofficial custom or practice must fail. Summary judgment is **GRANTED** as to this claim against A.C.S.D.

### c. Section 1983 Individual Liability

Plaintiffs further contend that Defendants Copeland and Starr are individually liable pursuant to section 1983. Dkt. No. 102 at 23. It is undisputed that neither Defendant Copeland nor Defendant Starr personally participated in any acts that deprived the Plaintiffs of their constitutional rights. Instead, Plaintiffs contend that Starr and Copeland are personally liable as Waters's supervisor. Dkt. No. 102 at 21. Both individual Defendants insist

that they are entitled to qualified immunity on Plaintiffs' section 1983 claims. Dkt. No. 108 at 10.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be entitled to qualified immunity, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[11] Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (citations omitted).

If a defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate: (1) that the defendant's alleged actions violated a constitutional or statutory right; and (2) that such a right was clearly established. Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003). Courts have the discretion to determine which of these two prongs it will address first. See Pearson, 555 U.S. at 232; see also Williams v. Russo, 636 F. App'x 527, 532 (11th Cir. 2016).

---

[11] Plaintiffs do not dispute that Defendants were acting within their scope of discretionary authority when the alleged violations occurred. Dkt. No. 88-1 at 25.

## 1. Constitutional Violation

### A. Supervisor Liability

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Fla. Dep't of Labor & Emp. Sec., 133 F.3d 797, 802 (11th Cir. 1998). As such, supervisory officials can be held liable under section 1983 actions for constitutional violations on two grounds: (1) "the supervisor personally participates in the alleged constitutional violation," or (2) "there is a causal connection between the actions of the supervisor and the alleged constitutional violation." Id. (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). The requisite causal connection is established when either: (1) "a 'history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivations, and he or she fails to do so,' or (2) when a supervisor's 'improper custom or policy results in deliberate indifference to constitutional rights.'" Doe, 604 F.3d at 1266 (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Plaintiffs suggest that a history of widespread abuse warrants liability for Defendants Copeland and Starr. Dkt. No. 102 at 22-23. To show widespread abuse, Plaintiffs "must demonstrate a history of rampant, flagrant, obvious, and continuous constitutional violations against students by [Waters] or other

28

teachers at [Appling County High School] that went unchecked by
[supervising officials]." Hackett, 238 F. Supp. 2d at 1359. For
example, in Broward, two reports of alleged sexual misconduct
within a year was insufficient to prove a pattern of widespread
abuse occurred under the principal—even though it was enough to
create a jury question for Title IX liability. 604 F.3d at 1267.
However, "[w]hen rights are systematically violated on a near-
daily basis, such abuses are sufficiently egregious to warrant
supervisory liability, even if it is a single 'bad apple' engaging
in the repeated pattern of unconstitutional behavior." Holloman ex
rel. Holloman v. Harland, 370 F.3d 1252, 1294 (11th Cir. 2004);
see also Valdes v. Crosby, 450 F.3d 1231, 1244 (11th Cir. 2006)
(denying summary judgment for a prison supervisor when thirteen
deprivations occurred across the prison over the course of one and
one-half years). Here, Plaintiffs have failed to demonstrate how
widespread abuse of an obvious and rampant nature persisted under
either Defendant's supervision.

### i.   Defendant Copeland

Plaintiffs point to the PSC Report and the August 2014 bedroom
incident to demonstrate the "widespread abuse" that occurred under
the supervision of Defendant Copeland. Dkt. No. 102 at 22. However,
as Defendants point out, Defendant Copeland did not become
superintendent until after Waters was hired. Dkt. No. 108 at 11.
Thus, even drawing all inferences in favor of Plaintiffs, the

evidence does not show that Copeland had any personal knowledge of the allegations contained in the PSC Report as a supervisor. <u>N.P. by Perillo v. Sch. Bd. of Okaloosa Cnty., Fla.</u>, No. 3:18CV453-MCR-HTC, 2019 WL 4774037, at *6 (N.D. Fla. Sept. 30, 2019) (dismissing a claim for supervisor liability because the plaintiff failed to show an official was a supervisor during the relevant time period of abuse or had knowledge of any report of abuse). It is undisputed that Defendant Copeland became aware of the August 2014 complaint by Ms. Brinkley. However, that complaint was an "[i]solated occurrence[]" and thus cannot demonstrate that sexual misconduct had become a widespread practice under Copeland's supervision. <u>See Broward</u>, 604 F.3d at 1266. Plaintiffs do not meet the exacting standard of supervisory liability with respect to Defendant Copeland.

### ii.  Defendant Starr

It is undisputed that Defendant Starr had knowledge of both the PSC Report and the August 2014 incident. However, only the August 2014 incident led to an allegation of misconduct under Defendant Starr's supervision. Defendant Starr's knowledge of the Camden County investigation came from his screening of Water's PSC Report, all of which occurred in a different school district outside of Defendant Starr's supervision.[12] <u>See</u> <u>N.P. by Perillo</u>,

---

[12] Plaintiffs base their assertion of Starr's section 1983 liability solely on the theory of supervisory liability through a history of widespread abuse. Therefore, the Court does not address the possibility of Starr's section 1983

2019 WL 4774037, at *9 (dismissing section 1983 supervisory claim because knowledge of someone else's prior investigation was an insufficient basis to infer widespread abuse); see also Dorf v. City of Evansville, No. 11-CV-351-S, 2012 WL 1440343, at *3 (D. Wyo. Apr. 22, 2012) (suggesting that, at the very least, a section 1983 plaintiff must show that the defendant was in charge of other state actors during the relevant time of the committed violations), aff'd sub nom. Dorf v. Bjorklund, 531 F. App'x 836 (10th Cir. 2013). Plaintiffs have not offered any legal authority for the proposition that a supervisor can be deemed liable for failing to correct abuse occurring outside of his or her supervision.

Moreover, many of the undisputed facts here contradict any suggestion that Defendant Starr allowed the August 2014 incident to go "unchecked." After conducting his own independent investigation, Defendant Starr turned the matter over to DFACS. Dkt. No 108 at 11. On top of that, Defendant Starr also issued a directive letter which instituted a blanket prohibition on discussing personal matters with students. Dkt. No. 102-1 ¶ 43.

---

liability based on an independent act or omission such as a hiring decision. Compare Est. of Tilson v. Rockdale Cnty., Ga., No. 1:19-CV-01353-JPB, 2021 WL 913937, at *6 (N.D. Ga. Mar. 10, 2021) (discussing the separate analysis for holding a supervisor liable based on a decision to hire); see also Bryan Cnty., 520 U.S. at 410 (distinguishing between liability imposed on the basis of a hiring decision and liability imposed on other grounds such as a supervisor's failure to train).

Furthermore, Starr advised Waters to have no further contact with Plaintiff Brinkley. Dkt. No. 102-25 at 6. Finally, Starr assigned a second teacher to be in all of Waters' classes and to co-advise the Envirothon team with Waters. Dkt. No. 102-1 ¶¶ 44-45. While these actions seem to have been ultimately ineffective at stopping Waters's misconduct, it does not show a repeated failure to take action that rises to the level of a separate constitutional violation under section 1983.

Even assuming *arguendo* that Defendant Starr had committed a constitutional violation, Plaintiffs have failed to show that Starr's supervision violated a clearly established right to overcome qualified immunity. Although a plaintiff does not "have to show that the precise conduct in question has been held unlawful," for a federal right to be clearly established, "its parameters 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Williams, 477 F.3d at 1300 (citing Anderson v. Creighton*,* 483 U.S. 635, 640 (1987)). Plaintiffs have not pointed to a single case where supervisory liability has attached for complaints of abuse that occurred beyond the scope of a defendant's supervision. Plaintiffs cite to Broward generally for support, but Broward *affirmed* a grant of summary judgment to a high school principal because two prior reports of abuse submitted under his supervision were still insufficient to meet the "rigorous standard" of

establishing supervisory liability. See Broward, 604 F.3d at 1266-67.

Ultimately, Plaintiffs acknowledge that they cannot identify a factually similar case to overcome qualified immunity, conceding that "prior factually similar cases to this case are difficult to locate." Dkt. No. 102 at 23. Instead, Plaintiffs seek to invoke the rare principle of obvious clarity, arguing that Starr's conduct was so egregious that "any reasonable official would know that his or her conduct violated the law." Id. (citing Corbitt v. Vickers, 929 F.3d 1304, 1312 (11th Cir. 2019)).

To be clear, the inquiry is not whether Waters' underlying misconduct was clearly established as a constitutional violation. Such an approach would contravene the well-established axiom that a supervisor cannot be held liable under the theory of *respondeat superior*. See Gebser, 524 U.S. at 285. Instead, the relevant inquiry is whether Defendant Starr's supervision, as an independent act, was so egregious that "all but the plainly incompetent or those who knowingly violate the law" would understand it as unconstitutional. Ashcroft v. Al-Kidd, 563 U.S. 731 (2011). The conduct at issue here does not satisfy this narrow exception. If anything, cases like Broward indicate that Plaintiffs have failed to sufficiently demonstrate that a constitutional violation on behalf of Defendant Starr occurred at all. Defendant Starr is protected by the doctrine of qualified

immunity; as such, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims for section 1983 supervisory liability.

### CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment, dkt. no. 88, is **GRANTED in part** and **DENIED in part.** The motion is **GRANTED** as to Plaintiffs' section 1983 claims against Defendants A.C.S.D., Starr, and Copeland. It is **DENIED** as to Plaintiffs' Title IX claim against A.C.S.D. Additionally, Plaintiffs' Motion to Strike, dkt. no. 113, is **DENIED.**

**SO ORDERED**, this 31st day of March, 2021.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA